14-80031

Molly
3/10/14

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAR 10 2014

FILED
DOCKETED 3/10/14
DATE   INITIAL

TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM,
SONNY LOW, J. R. EVERETT and JOHN BROWN,

*Plaintiffs and Respondents,*

v.

TRUMP UNIVERSITY, LLC, and DONALD J. TRUMP,

*Defendants and Petitioners.*

---

*Appeal from an Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification Entered on February 21, 2014 by the United States District Court for the Southern District of California Case No. 3:10-cv-0940-GPC-WVG · Honorable Gonzalo P. Curiel*

## DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP'S PETITION FOR PERMISSION TO APPEAL PURSUANT TO FRCP 23(f)

DAVID K. SCHNEIDER, ESQ.
YUNKER & SCHNEIDER
655 West Broadway, Suite 1400
San Diego, California 92101
(619) 233-5500 Telephone
(619) 233-5535 Facsimile

JILL A. MARTIN, ESQ.
c/o TRUMP NATIONAL GOLF CLUB LOS ANGELES
One Trump National Drive
Rancho Palos Verdes, California 90275
(310) 303-3225 Telephone
(310) 265-5522 Facsimile

*Attorneys for Defendants and Petitioners Trump University, LLC and Donald J. Trump*

---

 COUNSEL PRESS · (800) 3-APPEAL

PRINTED ON RECYCLED PAPER 

## CORPORATE DISCLOSURE STATEMENT

Petitioner Trump University, LLC asserts that it has no parent corporation

and there is no publicly held corporation that owns ten percent or more of its stock.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

I. INTRODUCTION ................................................................. 1

II. FACTUAL AND PROCEDURAL BACKGROUND ................................. 2

    A. Trump University ......................................................... 2

    B. The Diversity of TU Students and Their Experiences with TU ........... 3

    C. The Class Action ......................................................... 5

    D. The Motion for Certification ............................................. 5

    E. The Class Certification Ruling ........................................... 5

III. APPLICABLE LEGAL STANDARD ......................................... 6

IV. QUESTIONS PRESENTED ................................................... 6

V. REASONS THE PETITION SHOULD BE GRANTED ............................ 7

    A. The District Court Erred in Failing to Apply *Wal-Mart* to
       Determine Whether Class Certification Is Appropriate When
       No Common Answers or Even Common Evidence Can Be
       Generated By the Certification............................................ 7

        1. Common Evidence Does Not Exist to Answer the
           Question Whether Donald Trump Hand-Picked All
           Instructors. ...................................................... 9

        2. Common Evidence Does Not Exist to Answer the
           Question Whether All Members Received Year-Long
           Support and Mentoring. ........................................ 10

    B. The District Court Erred by Creating Its Own Standard of
       "Highly Likely" Exposure to Advertisements, in Direct
       Contravention of This Court's Holding in *Mazza*....................... 11

**TABLE OF CONTENTS: (continued)**                                    <u>Page(s)</u>

       1.    The District Court Did Not Enforce the Required Uniform Exposure of All Class Members to the Same Misrepresentations ................................................................. 11

       2.    The Further Error of the District Court – Replacing the Strict *Mazza* Standard with a "Highly Likely" Standard .......... 15

   C.    The District Court Erred by Failing to Apply the Rigorous Analysis Required By *Poulos v. Caesar's World, Inc.* ....................... 16

   D.    The District Court Erred in Failing to Apply *Comcast* and Not Requiring Plaintiffs to Present a Legally and Practically Sufficient Method of Determining Damages for All Class Members ................................................................................. 19

VI.    RELIEF SOUGHT ........................................................................ 20

CERTIFICATE OF COMPLIANCE ................................................... 21

STATEMENT OF RELATED CASES ................................................ 22

EXHIBIT 1:  U.S. District Court Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, Entered on February 21, 2014

DECLARATION OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Chamberlan v. Ford Motor Co.,*
402 F.3d 952 (9th Cir. 2005)......................................................6, 14, 16, 19, 20

*Comcast v. Behred,*
133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) ...................................1, 2, 7, 19, 20

*Davis v. Homecomings Financial,*
2006 WL 2927702 (W.D. Wash. 2006) .........................................................18

*Gonzalez v. Proctor & Gamble Co.*
247 F.R.D. 616 (S.D. Cal. 2007).....................................................................14

*Mazza v. Am. Honda Motor Co.*
666 F.3d 581 (9th Cir. 2012)................................... 1, 2, 7, 11, 13, 14, 15, 16

*Poulos v. Caesar's World, Inc.,*
379 F.3d 654 (9th Cir. 2004)........................................................1, 16, 17, 18, 19

*Tanedo v. East Baton Rouge Parish School Bd.,*
2011 WL 7095434 (C.D. Cal. 2011) ..............................................................18

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541, 180 L.Ed.2d 374 (2011) .................................1, 6, 7, 8, 9, 10

## Statutes and Rules

Federal Rule of Civil Procedure 23(b)(3)..................................................................19

Federal Rule of Civil Procedure 23(f) ................................ 1, 6, 7, 10, 14, 16, 19, 20

# I.    INTRODUCTION

Defendants respectfully request this Court to grant this petition for immediate appeal under Federal Rule of Civil Procedure 23(f).  The petition seeks to review the District Court's order granting certification of a plaintiff consumer class of approximately 2,500 students who attended defendants' real estate investment training programs.  The order is manifestly erroneous as a matter of law because the District Court failed to follow the controlling authority of *Wal-Mart Stores, Inc. v. Dukes*[1], *Mazza v. Am. Honda Motor Co.*[2], *Poulos v. Caesar's World, Inc.*[3] and *Comcast v. Behred.*[4]

First, The District Court failed to apply the mandated precedent of the United States Supreme Court in *Wal-Mart v. Dukes* that a classwide proceeding must generate **common answers**.  The District Court determined that three questions were common to the class, but then it never analyzed nor even considered whether common answers were possible, let alone exist.  Had the District Court conducted that analysis as required by law, it would have concluded that plaintiffs failed to satisfy Rule 23 requirements.

---

[1] 131 S. Ct. 2541, 180 L.Ed.2d 374 (2011)

[2] 666 F.3d 581 (9th Cir. 2012)

[3] 379 F.3d 654 (9th Cir. 2004).

[4] 133 S. Ct. 1426, 185 L.Ed.2d 515 (2013)

Second, the District Court failed to follow this Court's recent and dispositive holding in *Mazza* that class certification in this type of case allows a presumption of reliance only when **all** class members are exposed to the **same** alleged misrepresentations. The District Court concluded that the presumption was met, despite the undisputed fact that not even all named plaintiffs were so exposed, much less all class members.

Third, the District Court failed to follow the mandated precedent of the United States Supreme Court in *Comcast* by finding that plaintiffs presented an adequate method for determining damages, when in fact they presented **no method** beyond demanding a full refund for every class member.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Trump University[5]

Trump University ("TU") began operations in 2005. It was the idea of educational entrepreneur Michael Sexton, who wanted to sell on-line real estate education programs. Mr. Trump met extensively with Mr. Sexton to discuss overall methods and goals and selected original faculty members. They included Prof. Gary Eldred of Stanford and Attorney JJ Childers – a noted wealth management specialist.[6]

---

[5] The facts in Section II are taken from Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification. ECF 138 and Supporting Exhibits ECF 139-143.

[6] ECF 139, Exs. 1-4.

TU introduced live seminars in 2007 and later introduced the mentor program involving individualized one-on-one training of students by experienced real estate professionals. As the TU faculty grew, Mr. Trump continued to meet many of the instructors, and he approved all of their resumes.

By 2009, TU provided more than 200 different programs taught by more than 40 instructors and 35 mentors. The programs ranged from a free 90-minute preview, to a 3-day seminar in basic real estate investing, to 3-day, in-person, one-on-one mentoring, to advanced workshops, to individualized coaching as well as other customized programs.[7]

**B.      The Diversity of TU Students and Their Experiences with TU Different Programs and Different Instructors:** Approximately 6,500 students across the country paid between $995 and $1,995 for the 3-day basic seminar. This seminar was taught hundreds of times by about 20 instructors. The presentations varied by about 30-35%. Approximately 750 students paid between $10,000 for three 3-day workshops, and $35,000 for five 3-day workshops, plus a 3-day customized personal mentorship with 35 different mentors, followed by year-long mentor access.

---

[7] ECF 139, Ex. 6.

**Different Student Evaluations and Experiences:** There is an extensive record of 10,000 student evaluations of programs and mentors, 84 testimonials, and 14 declarations.[8] 97% of all evaluations for all TU events rated TU's training, instructors, and mentors 4.9 on a 1-5 scale.[9] That 97% includes five of the six named Plaintiffs wo each rated TU a perfect "5" and provided comments such as *"Training was excellent, best real estate training I have gone to."*[10] Lead Plaintiff Makaeff also gave a videotaped testimonial <u>after</u> she completed <u>ten months</u> of TU seminars and mentoring and said that her instructors and mentors were "*great*" and "*awesome.*"

Thousands of other students provided similar handwritten statements on their evaluations, such as: *"learned more in the last three days than the last 15 years"*; "*exceeded expectations,"and "Trump University is some of the best money I've ever invested."* The evaluations also confirm that students had very different reasons to attend TU. For example: *"I came to this seminar just to be a better resource for my clients."* Finally, many students made money on their real estate investments shortly after their TU training. The point is that the class is completely diverse in what they expected, what they purchased, what they received and the results of their training.[11]

---

[8] ECF 139-5, Exs. 11-14.
[9] ECF 139-5, Exs. 11 & 12; ECF 143, Ex. 24.
[10] ECF 143, Ex. 25.
[11] ECF 143, Exs. 19, 20, 14(a-n), 22 and 23.

### C.  The Class Action

This case was filed in 2010 by Ms. Makaeff.  Other named plaintiffs joined later that year, some of whom have since been dismissed.

### D.  The Motion for Certification

The moving papers for class certification were filed in September 2012.  The original moving papers sought certification for a nationwide class divided into 14 subclasses.[12]

### E.  The Class Certification Ruling

The District Court granted certification of a class totaling about 2,500 former TU students, divided into five subclasses in three states: California, New York, and Florida.  Three of the subclasses are based on the statutes of those three states barring unfair trade practices.  The remaining two subclasses are based on the statutes of California and Florida barring "elder abuse."  The District Court denied certification of another eight subclasses based on state common law claims.

---

[12] Order: (1) Granting in Part and Denying in Part Plaintiffs' Motion to Certify Class Action (ECF 298), p. 2, attached as Exhibit 1 ("Order").

## III.   APPLICABLE LEGAL STANDARD

FRCP Rule 23(f) permits a timely discretionary interlocutory appeal from a District Court order granting or denying a class action certification.  This Court has stated three principles justifying an interlocutory appeal of class certification.[13]

Defendants respectfully submit that the applicable principle here is "manifest error in the district court's certification opinion."[14]  For that principle to result in reversal of the certification order, this Court has instructed as follows:

> "The error in the district court's decision must be significant; bare assertions of error will not suffice.  Any error must be truly 'manifest,' meaning easily ascertainable from the petition itself. . . .."[15]

When a District Court ignores binding precedent, permission to appeal is warranted.[16]  As noted above, the District Court committed three crucial errors of law, each mandated by U.S. Supreme Court or Ninth Circuit precedent.  *Chamberlan* specifically recognized that these errors merit review and reversal.

## IV.   QUESTIONS PRESENTED

1.   Whether the District Court committed reversible error by ignoring the controlling Supreme Court authority of *Wal-Mart* when: (a) common

---

[13] *Chamberlan v. Ford Motor Co.,* 402 F.3d 952 (9th Cir. 2005).

[14] *Id. at 955.*

[15] *Id.* at p. 959 (citation omitted).

[16] *Id.* at 962.

answers among the class do not exist; (b) common evidence cannot resolve an issue that is central to the validity of the claim in one stroke; and (c) material differences among class members show that Rule 23 requirements of commonality and predominance cannot be met.

2. Whether the District Court committed reversible error when it ignored the controlling Ninth Circuit authority of *Mazza* that set forth when misrepresentations are sufficiently widespread and uniform to warrant class treatment, and instead the District Court created its own lower standard.

3. Whether the District Court committed reversible error when it ignored the controlling Supreme Court authority of *Comcast* requiring plaintiffs to propose a legally and practically workable method for computing damages.

## V. REASONS THE PETITION SHOULD BE GRANTED

### A. The District Court Erred in Failing to Apply *Wal-Mart* to Determine Whether Class Certification Is Appropriate When No Common Answers or Even Common Evidence Can Be Generated By the Certification.

The District Court determined that three questions were common to the class: (1) whether Defendants misrepresented that Trump University was an "accredited university"; (2) whether Defendants misrepresented that Donald

7

Trump was heavily involved in TU and "hand-picked" the TU instructors; and (3) whether Defendants made misrepresentations about "year-long" mentoring and interactive support provided by TU after various programs[17]

The District Court erred in its consideration of commonality when it failed to consider whether these common questions were susceptible to **common answers**. As the Supreme Court noted in *Wal-Mart,* one can almost always find common questions in any multi-party litigation; the key to class certification, however, is whether class certification can help generate common answers to these questions.[18] The *Wal-Mart* Court was clear that common contentions "must be of such a nature that it is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."[19]

Because TU students: (i) saw different ads—some without the purported misrepresentations--and some saw no ads; (ii) attended different programs taught by dozens of different instructors who made diametrically opposed representations about accreditation, and some made no representations about accreditation; (iii) had different instructors and mentors—some of whom indisputably were "hand-

---

[17] Order, p.14

[18] *Walmart*, 131 S.Ct. at 2551.

[19] *Id.* at 2545.

picked" by Mr. Trump; and (iii) got different support and results from their TU training, including some members who received far longer than one year of support, each student could not "have suffered the same injury" as required by *Wal-Mart*. The District Court never considered this issue. Here are two examples.

### 1.    Common Evidence Does Not Exist to Answer the Question Whether Donald Trump Hand-Picked All Instructors.

There is no dispute that TU instructors and mentors were not selected in the same way.  Mr. Trump personally met with and "hand-picked" the original TU instructors and mentors, including Prof. Gary Eldred of Stanford and Attorney JJ Childers.  Prof. Eldred taught live programs and mentored hundreds of TU students throughout 2007.  Between 2007 and 2010, JJ Childers taught thousands of TU students, **including** lead plaintiff Makaeff.[20]

Even if the District Court assumed that Mr. Trump's review of resumes for other TU presenters did not constitute "hand-picking" for those, the issue cannot be resolved by common evidence.  It cannot because many class members were taught by "hand-picked" Prof. Eldred and/or JJ Childers, while others were not.

The point is that there is no common evidence that can resolve this issue by its truth or falsity.  The issue turns on which students were taught by which instructors, and thus requires individual inquiry of each class member.  The

---

[20] ECF 143-1, Ex. 45.

9

District Court never evaluated this issue. Had the District Court applied the *Wal-Mart* standard to the "hand-picked" common question, the District Court would have concluded that plaintiffs did not meet the rigorous requirements of Rule 23 because there is no "common answer."

### 2. Common Evidence Does Not Exist to Answer the Question Whether All Members Received Year-Long Support and Mentoring.

What each student received was quite different, depending both on the instructor's and student's efforts. Named plaintiffs Everett and Oberkrom admitted that they each <u>chose</u> not to even meet with their mentors.[21] Their situation is totally different from students who received ongoing support far <u>longer</u> than one year. Again, the point is that there is no **common answer** to the "year-long" common question posed by the District Court. The evidence varies for each instructor as well as each student.

The "year-long" inquiry further depends on which programs students purchased. 80-90% of the class did not even purchase a mentorship. Many students purchased only the initial three-day introductory real estate program, which included no mentorship. Many students who attended that introductory program voluntarily chose to have no further contact with TU. By contrast, other

---

[21] ECF 143-1, Ex. 60-5895-96.

students purchased multiple three-day workshops and received support from their mentor for over a year or longer.

What **common** evidence can resolve the "year-long" question for **all** class members on this issue by its truth or falsity? The District Court never evaluated this issue. Had the District Court evaluated the issue, it would have concluded that no common answer or even common evidence exists.

**B. The District Court Erred by Creating Its Own Standard of "Highly Likely" Exposure to Advertisements, in Direct Contravention of This Court's Holding in *Mazza***

**1. The District Court Did Not Enforce the Required Uniform Exposure of All Class Members to the Same Misrepresentations**

The District Court made a presumption of reliance based on an erroneous finding that the **same** three misrepresentations were communicated to all class members as required by this Court's controlling opinion in *Mazza v. Am. Honda Motor Co.*[22] However, the District Court noted facts indicating that these three misrepresentations were not even communicated to all the named plaintiffs, much less all class members.

The *Mazza* Court gave very clear guidance concerning when a presumption of reliance could be applied in a putative consumer class action based on alleged misrepresentations, exactly like this case:

---

[22] 666 F.3d 581 (9th Cir. 2012).

11

". . .[T]he misrepresentations at issue here do not justify a presumption of reliance. This is so primarily because it is likely that many class members were never exposed to the allegedly misleading advertisements . . . ('An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class.'); *Cohen v. DIRECTV, Inc.,* 178 Cal.App.4th 966, 980 (2009 ('[California law does not] authorize an award . . . on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice.')

. . .

. . . . A presumption of reliance does not arise when class members 'were exposed to quite disparate information from various representatives of the defendant.' *See Stearns*, 655 F.3d at 1020 (9th Cir. 2011). California courts have recognized that *Tobacco II* does not allow 'a consumer who was never exposed to an alleged false or misleading advertising . . . campaign' to recover damages under California's UCL. *Pfizer, Inc. v. Superior Court*, 182 Cal.App.4th 622, 632 (2010); *Davis-Miller*, 201 Cal.App.4th at 633. For everyone in the class to have been exposed to the omissions, as the dissent claims, it is necessary for everyone in the class to have viewed the allegedly misleading advertising. Here the limited scope of that advertising makes it unreasonable to assume that all class members viewed it. *Pfizer, Inc.,* 182 Cal.App.4th at 633-34.

. . .

In the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."[23]

---

[23] *Id.* at 595-96 (West citations omitted).

The District Court failed to impose that standard on lead named plaintiff Makaeff. She testified that she <u>never saw any advertising</u> by TU.[24]  She also testified that she <u>never attended TU's free 90-minute introductory program</u>, which supposedly was the primary method used by TU to communicate the alleged misrepresentations to its students.[25]  The undisputed facts are that of the four named plaintiffs, <u>one of them never saw a TU </u>ad nor attended a TU free preview.  Moreover, <u>none of the four named plaintiffs saw the same TU ads</u>.[26]

Similarly, the District Court determined that a common question existed as to the alleged misrepresentation that TU was an "accredited university."  But the required *Mazza* threshold issue therefore is whether TU represented to **all** class members that Trump University was "accredited."  Two named plaintiffs were never told that TU was accredited.  Moreover, former TU phone sales employee Jason Nichols-fired by TU and now represented by <u>plaintiffs' counsel-</u> testified that he specifically told consumers and putative class members that TU was <u>not</u> accredited.[27]  Plaintiffs allege that some students were told that TU was accredited, but the point is that **all** students did not receive that same alleged

---

[24] ECF 143, Ex. 32.

[25] Order, p. 8.

[26] ECF 143, Ex. 33.

[27] ECF 143-1, Ex. 42-5688.

misrepresentation. In *Gonzalez v. Proctor & Gamble Co.*[28] another judge of the

District Court addressed the identical issue, and correctly concluded that a

presumption of reliance is <u>not</u> available:

> Plaintiff directs the court's attention to California case law
> suggesting that in some consumer fraud actions, reliance may
> be inferred on a class-wide basis. <u>However, the Ninth Circuit</u>
> <u>has stated that presumption of reliance typically is only</u>
> <u>permitted in securities fraud cases, and only in cases based on</u>
> <u>omissions as opposed to affirmative representations.</u>
>
> . . .
>
> The Court finds that this case is controlled by those California
> cases that <u>refused to certify a class when the plaintiffs could not</u>
> <u>allege that the same representations were specifically made to</u>
> <u>each class member</u>, thus preventing the court from permitting
> an inference of reliance.[29]

If the named plaintiffs and class representatives cannot meet the *Mazza*

standard of all being exposed to the same misrepresentations, then the entire

plaintiff class cannot meet that standard either. The District Court was bound to

enforce the *Mazza* standard in this case, but did not. That was a manifest error of

law under *Chamberlan*, and supports review of the District Court's certification

ruling under Rule 23(f).

---

[28] 247 F.R.D. 616 (S.D. Cal. 2007)

[29] *Id.* At 623-24 (emphasis added).

### 2. The Further Error of the District Court – Replacing the Strict *Mazza* Standard with a "Highly Likely" Standard

The District Court did not only fail to apply the strict *Mazza* standard requiring all class members to be exposed to the same misrepresentations. The District Court also invented its own standard to replace it, namely an unprecedented "highly likely" standard.

The District Court began with an accurate statement of the law: "The critical question in this case, as posed in *Tobacco II*, is whether the putative class members were exposed to the same alleged misrepresentations."[30] The District Court then acknowledged that TU did not have the "long-term advertising campaign" in *Tobacco II*, and was much more similar to the "limited advertising" in *Mazza*, although it was more targeted to its intended audience.

However, the District Court then abandoned the strict *Mazza* standard for its own "highly likely" standard, and confused that unlawful standard with the unrelated objective standard for a material misrepresentation:

> "The effect of [the TU] campaign was to make it <u>highly likely</u> that each member of the putative class was exposed to the same misrepresentations. There is substantial evidence that class members paid for TU seminars for reasons that track the advertising and promotional information provided in the highly orchestrated campaign. The Court finds substantial evidence

---

[30] Order, p. 22.

that members of the California subclass were "likely to be deceived" by TU's advertisements."[31] (emphasis added).

Whether the class was "likely to be deceived" by TU's misrepresentations has no bearing on whether all class members were exposed to those same misrepresentations in the first place. We know they were not so exposed, because we know their putative class representatives were not. Under *Mazza*, the District Court was bound to reject the presumption of reliance without uniform exposure. The failure to do so was manifest error under *Chamberlan*, and supports review of the District Court's certification ruling under Rule 23(f).

## C.   The District Court Erred by Failing to Apply the Rigorous Analysis Required By *Poulos v. Caesar's World, Inc.*

The District Court failed to address the issue of the "knowledge, motivations, and expectations" of each class member, as required by *Poulos v. Caesar's World, Inc.*[32] The actual impact on the students of the ads, materials and training must be determined. That can only be done by individual inquiry into what ads – if any – they saw, what representations – if any – were made to them, what personal expectations they had, what courses they took and why, and how they used their training afterwards. The "rigorous analysis" for certifying a class on

---

[31] Order, p. 22.

[32] 379 F.3d 654, 655 (9th Cir. 2004).

predominance **requires** weighing individual factors against class-wide ones. The District Court never addressed the issue or undertook that analysis.

This Court has provided excellent guidance for that weighing. *Poulos* held that a diverse group of potential claimants requires individual inquiry when that diversity includes differing "knowledge, motivations, and expectations."[33] *Poulos* involved RICO claims brought by a putative class of gamblers who used video poker or electronic slot machines.[34] The "misrepresentation" was that these devices looked like hand-dealt poker games and mechanical slot machines, but actually delivered pre-determined computer-driven outcomes unknown even to experienced gamblers.[35]

The *Poulos* District Court denied class certification on the ground that individualized reliance issues related to proof of causation would predominate over common questions, and this Court affirmed.[36] This Court explained:

> "Gamblers do not share a common universe of knowledge and expectations – one motivation does not 'fit all.' Some players may be unconcerned with the odds of winning, instead engaging in casual gambling as entertainment or a social activity. Others may have played with absolutely no knowledge or information regarding the odds of winning such that the appearance and labeling of the machines is irrelevant and did nothing to influence

---

[33] *Id.*

[34] *Id.* at 658.

[35] *Id.* at 659-61.

[36] *Id.* at 658.

their perceptions. Still others, in the spirit of a calculated risk,
may have played fully aware of how the machines operate. Thus,
to prove proximate causation *in this case*, an individualized
showing of reliance is necessary."[37]

This Court concluded that generalizations about gamblers would not suffice:

"Indeed, there may be no single, logical explanation for
gambling – it may be an addiction, a form of escape, a casual
endeavor, a hobby, a risk-taking money venture, or scores of
other things…. Consequently, we conclude that classwide
circumstantial evidence would not suffice to prove causation in
this case."[38].

Other courts in the Ninth Circuit have insisted on individual inquiry into the

individual motivations and decisions of potential class members due to the unique

nature of the class, claims, or facts at issue. *See, e.g., Tanedo v. East Baton Rouge

Parish School Bd.*[39] (Filipino teachers recruited for US work, but then overcharged

for purported visa fees by employer, denied certification of fraud claims because

individual inquiry was needed to determine their reasons for immigrating); *Davis

v. Homecomings Financial*[40] (claimed reliance by class of home loan borrowers

raised issues of credibility and state of mind needing individualized consideration).

In this case, the named plaintiffs and all 2,500 class members here had

varying "knowledge, motivations, and expectations" before, during, and after their

---

[37] *Id.* at 665-66 (emphasis in original).

[38] *Id.* at 668

[39] 2011 WL 7095434, *9 (C.D. Cal. 2011)

[40] 2006 WL 2927702, *7 (W.D. Wash. 2006)

TU training. The District Court never undertook the *Poulos* analysis. If it had, the District Court would have concluded that plaintiffs did not meet the predominance requirement of Rule 23. That failure was manifest error under *Chamberlan*, and supports review of the District Court's certification under Rule 23(f).

### D. The District Court Erred in Failing to Apply *Comcast* and Not Requiring Plaintiffs to Present a Legally and Practically Sufficient Method of Determining Damages for All Class Members.

Supreme Court precedent requires that where a proposed Rule 23(b)(3) class involves individualized damages, the plaintiff must provide the district court with a method that is capable of measuring damages on a classwide basis.[41] Without such a method, *Comcast* instructs that the predominance requirement of Rule 23(b)(3) cannot be met, as "questions of individual damage calculations will inevitably overwhelm questions common to the class." Here, the only "method" of measuring damages proposed by plaintiffs was not a measurement at all, but merely a demand that plaintiffs receive all money they paid, **regardless of the value they actually received for their money**.

Establishing accurate damages, if any, will require individual inquiry of each class member because the named plaintiffs and class members got different value from their TU programs. Class members purchased very different programs, some

---

[41] *Comcast*, 133 S. Ct. at 1433.

with mentorships and many without. Some students made money using their training and some never tried. Some valued their experience as "worth it," and others attended solely to network. Some started careers in real estate, while others wanted the information just to better manage their family real estate portfolios. Many class members received extra classes and mentoring for free. Some students received partial refunds, and some of those signed releases.

The point is that the value each class member received was unique, and so their potential damages are equally unique.[42] The District Court gave no consideration to these differences, and plaintiffs offered no methodology at all for calculating damages or differences in damages among class members. The District Court's failure to apply *Comcast* was manifest error under *Chamberlan*, and supports review of the District Court's certification ruling under Rule 23(f).

## VI.   RELIEF SOUGHT

Defendants respectfully request that this Court grant their petition and accept review of the District Court's order of 2/21/14 granting class certification.

Dated:  March 7, 2014

Respectfully submitted,
YUNKER & SCHNEIDER

David K. Schneider
Attorneys for Defendants/Petitioners
Email:  dks@yslaw.com

---

[42] ECF 139-5, Exs. 11-14, ECF 143, Exs. 21, 25 and 27.

## CERTIFICATE OF COMPLIANCE

This Petition complies with the page limitations of Fed. R. App. P. 5(c)

because this brief is twenty (20) pages, excluding the parts of the brief exempted

by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface

requirements of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirements of

Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally

spaced typeface of 14 points.


Dated:  March 7, 2014                    YUNKER & SCHNEIDER

                                         By: _____
                                             David K. Schneider
                                             YUNKER & SCHNEIDER
                                             Email:  dks@yslaw.com

                                         Attorneys for Defendants/Petitioners,
                                         TRUMP UNIVERSITY, LLC and
                                         DONALD J. TRUMP

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendants state that *Cohen v. Donald J. Trump,* Case No. 13-cv-2519-GPC-WVG is related to the present case.

# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11 | TARLA MAKAEFF, et al., on Behalf of Herself and All Others Similarly Situated, | Case No. 3:10-cv-0940-GPC-WVG |
| 12 | | **ORDER:** |
| 13 | Plaintiffs, | **1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS'** |
| 14 | vs. | **MOTION TO CERTIFY CLASS ACTION, APPOINT CLASS** |
| 15 | TRUMP UNIVERSITY, LLC, et al., | **REPRESENTATIVES, AND APPOINT CLASS COUNSEL** |
| 16 | Defendants. | [Dkt No. 122.] |
| 17 | | **2) DENYING MOTIONS TO STRIKE** |
| 18 | AND RELATED COUNTERCLAIM | [Dkt. Nos. 138-2, 196, 211.] |
| 19 | | |

20

21      Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom, Sonny Low, J.R.

22  Everett and John Brown have filed a putative class action complaint against Trump

23  University, LLC ("TU")[1] and Donald J. Trump ("Donald Trump"). The gravamen

24  of the action is that Defendants made false representations in advertisements,

25  mailings and programs regarding Donald Trump's involvement in TU and the

---

26      [1] After the filing of this action, the New York Department of Education demanded that
27  Trump University remove the word "University" from its title. Trump University changed its
    name to Trump Entrepreneur Initiative, LLC. As the complaint was filed prior to the change in
28  name, and as neither party requested to substitute Defendants, the Court continues to refer to the
    Defendant as Trump University.

contents of the programs that students would receive. On September 24, 2012, Plaintiffs filed a motion for class certification, appointment of class representatives, and appointment of class counsel. (Dkt. No. 122, "Pl. Mtn.") The proposed nationwide class is comprised of:

> All persons in the United States who purchased a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program ("LiveEvents") within the applicable statute of limitations and have not received a full refund. Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

(Pl. Mtn. at 13.)

Plaintiffs also propose the certification of 14 subclasses, including three single-state subclasses represented by Plaintiffs who reside in California, New York, and Florida alleging violations of deceptive practices laws in their home states. (Dkt. No. 122-7, "Proposed Trial Plan.") [2]

The motion has been fully briefed. (Dkt. Nos. 138, 195.) In addition to the pending motion for class certification, the parties have filed and fully briefed several related motions to strike and objections to evidence. (Dkt. Nos. 138-4, "Def. Obj. to Evidence," 195-9, 213; Dkt. Nos. 138-2, "Def. Mtn. to Strike," 192, 212; Dkt. Nos. 196, "Pl. Mtn. to Strike," 210, 233; Dkt. Nos. 211, "Def. Obj. to Reply," 221, 230.)

A hearing was held on November 8, 2013. Following careful consideration of the parties' oral arguments, legal briefings and applicable law, and for the reasons set forth below, the Court hereby **GRANTS** in part and **DENIES** in part Plaintiffs' motion.

---

[2] Plaintiffs filed a notice of correction following the November 8 hearing, providing an amended proposed class definition and six potential subclasses. (Dkt. No. 279.) Defendants replied. (Dkt. No. 280.) To the extent that Plaintiffs fail to cite any basis for the Court to allow ex parte amendments to the proposed class definition, the Court declines to address any amended proposed class definitions absent formal motion and the opportunity for full briefing.

# I.   BACKGROUND

## A.  Procedural Background

On April 30, 2010, Plaintiff Tarla Makaeff ("Makaeff") filed a class action complaint against Trump University, LLC, alleging violations of California, New York, and Florida consumer statutes as well as several common law causes of action. (Dkt. No. 1.) On May 26, 2010, Defendant Trump University, LLC, filed a counterclaim against Plaintiff Makaeff for defamation. (Dkt. No. 4.)[3]

The complaint has been amended a number of times, ultimately resulting in the current operative pleading, the third amended complaint (TAC), filed September 26, 2012. (Dkt. No. 128.) The TAC named Plaintiffs include Tarla Makaeff, Brandon Keller, Ed Oberkrom, Sonny Low, J.R. Everett, and John Brown. Defendants include Trump University, LLC, Donald J. Trump, and DOES 2 through 50 ("Defendants"). On January 30, 2013, the case was transferred to the undersigned judge. (Dkt. No. 190.)

## B.  Complaint's Allegations

The TAC alleges the following causes of action: (1) unlawful, fraudulent and unfair business practices in violation of Cal. Bus. & Prof. Code section 17200; (2) deceptive practices and misrepresentation in violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750 *et seq.*; (3) untrue and misleading advertisement in violation of Cal. Bus. & Prof. Code section 17500 *et seq.*; (4) breach of contract against Trump University; (5) breach of the implied covenant of good faith and fair dealing against Trump University; (6) money had and received; (7) negligent misrepresentation; (8) fraud; (9) false promise; (10)

---

[3] On June 30, 2010, Plaintiff Maekoff filed a motion to strike Defendant's counterclaim against her pursuant to California Code of Civil Procedure section 425.6, anti-SLAPP statute, which the Court denied. (Dkt. Nos. 14, 24.) Following Plaintiff's appeal, the U.S. Court of Appeals for the Ninth Circuit reversed this Court's order denying Plaintiff's motion to strike and remanded to the District Court for further proceedings. (USCA Case No. 11-55016; App. Dkt. No. 60.) Defendant/Appellee Trump University, LLC, filed a petition for en banc rehearing, which the Ninth Circuit granted. (App. Dkt. No. 61.) On November 27, 2013, the Ninth Circuit issued an order denying rehearing en banc. (Dkt. No. 281.)

deceptive acts and practices in violation of § 349 of New York's **General Business Law**; (11) financial elder abuse in violation of Cal. Welf. & Inst. Code § 15600, *et seq.*; (12) unfair competition, practices, or acts in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*; (13) misleading advertisement in violation of the Florida Misleading Advertising Law, Fla. Stat. § 817.41; and (14) unjust enrichment. [4]

Plaintiffs bring this action on behalf of all individuals who purchased Trump University, LLC ("TU") real estate investing seminars. **Plaintiffs' allegations** involve three tiers of programs: (1) the free preview; (2) a three-day fulfillment seminar; and (3) Trump Elite programs. [5] The TAC alleges that the Defendants made material misrepresentations in advertisements, mailings, promotions and the free preview to lead prospective customers to purchase **Defendants'** fulfillment and elite programs. The named Plaintiffs paid anywhere from $1,495 for a three-day fulfillment seminar up to $35,000 for the "Trump Gold Elite Program."

Plaintiffs allege TU and Donald Trump made the following common misrepresentations in invitations, advertisements, and at the free program and fulfillment seminar: (1) Trump University was an accredited university; (2) students would be taught by real estate experts, professors and mentors hand-selected by Mr. Trump; and (3) students would receive one year of expert support and mentoring. [6]

### 1. Allegations Against Donald J. Trump

Defendant Donald Trump is a businessman, "real estate tycoon," author, television personality and former presidential candidate. According to Mr. Trump,

---

[4] Unless otherwise indicated, each cause of action names both Trump University and Donald J. Trump as a defendant, and all factual allegations are taken from the third amended complaint. (Dkt. No. 128, "TAC.")
[5] The parties also refer to the TU seminars and programs as "Live Events."
[6] In the Third Amended Complaint, Plaintiffs alleged additional misrepresentations or instances of deceptive behavior by TU instructors. However, in their recent filings and at the November 8, 2013 hearing, Plaintiffs have narrowed their focus to the "core" misrepresentations of Mr. Trump and whether Trump University was a "university."

1   estimates of the monetary value of the "Trump" brand have exceeded three billion

2   dollars. (Dkt. No. 122-4 at 49, "Trump Depo.") Plaintiffs contend Defendant

3   Donald Trump is personally liable for the misrepresentations and misconduct at

4   issue because of his representations and involvement in Trump University.

5   Plaintiffs point to the following connections between Donald Trump and Trump

6   University:

- Donald Trump is the founder and Chairman of Trump University, and
  authorized TU to use his name, photos, and quotes for all TU seminar
  presentations;
- Print advertisements, email correspondence, letters, and TU website content
  prominently feature Donald Trump's quotes, image, logo, and signature;
- Donald Trump reviewed and authorized TU advertisement and content;
- Donald Trump personally financed Trump University, reviewed all TU
  financial statements and print and mail advertisements; and
- Donald Trump represented that he personally hand-picked the TU instructors
  and mentors.

### 2. Advertising, Website and Invitations to Free Preview

15      Plaintiffs allege TU relied on free introductory previews throughout the

16   United States in order to ensnare prospective customers through the use of

17   deception and misrepresentations.  The free previews were preceded by an

18   orchestrated outreach campaign utilizing mailed invitations as well as a TU

19   website, Facebook page, radio, and newspaper advertising. (TAC ¶ 40; Dkt. No.

20   122-4 at 7, "Timeline for Preview.") While the content of the materials varied,

21   Plaintiffs allege that all of the marketing materials uniformly referred to the

22   business as "Trump University." Further, the materials uniformly claimed that

23   Donald Trump was integrally involved in the teaching of students at Trump

24   University. (TAC ¶¶ 40, 43.)

25      For example, print advertisements sent by TU included quotes such as "I can

26   turn anyone into a successful real estate investor, including you," and "I'll show

27   you how." (TAC ¶¶ 19(c), (e).) The home page of the TU website displayed a large

28   photograph of Mr. Trump and the message: "Are YOU My Next Apprentice?

1  Prove it to me!" Emails sent by TU to thousands stated "76% of the world's

2  millionaires made their fortunes in real estate . . . I'm ready to teach you how to do

3  it too." (TAC ¶ 19(d).) Print advertisements and letters signed by Mr. Trump told

4  prospective customers that they would be shown real estate strategies by Mr.

5  Trump's "hand-picked experts." (TAC ¶¶ 19(c), (f).)

6      **3. The Free Preview**

7      Plaintiffs assert that the purpose of the free preview was to "up-sell"

8  attendees to the $1,495 Fulfillment Seminar, and that the goal of the $1,495

9  Fulfillment Seminar was to up-sell participants to the Elite programs. (TAC ¶ 15.)

10  To advance the "up-sell" scheme, Defendants allegedly promised participants that

11  they would learn Trump's secrets from Trump's hand-picked instructors over the

12  course of a one-year apprenticeship. (TAC ¶ 43.) Plaintiffs cite to numerous

13  excerpts from transcripts of the free preview and three-day programs where

14  instructors repeated the claim that Mr. Trump hand-picked the instructors and

15  mentors. (Dkt. No. 195-3, "Pl. Reply, Ex. 88" at 594-605.)

16      However, Plaintiffs claim TU instructors and mentors were not hand-picked

17  by Mr. Trump. During discovery, Plaintiffs requested the names of Trump

18  University speakers, instructors and mentors that were hand-picked by Mr. Trump.

19  In interrogatory responses, Mr. Trump stated that he "personally was involved in

20  the selection of Don Sexton, Gary Eldred, Michael Gordon and Jack Kaplan.

21  Additionally, most if not all speakers, instructors and mentors were selected by

22  Trump University representatives . . .". (Dkt. No. 195-5, "Jensen Decl. Ex. 105" at

23  5) (Response to Interrogatory No. 13). Don Sexton, Gary Eldred, Michael Gordon,

24  and Jack Kaplan are current or former professors who drafted and developed

25  Trump University course materials. (Id. at 3) (Response to Interrogatory No. 10).

26      **4. Fulfillment Seminar**

27      Individuals who paid for the Fulfillment Seminar were promised a three-day

28  seminar and one full year of expert interactive support. (TAC ¶ 53; Dkt. No. 195-3,

1  "Pl. Reply, Ex. 88" at 606-20.) Plaintiffs allege the seminar and year-long support

2  was actually a three-day infomercial accompanied by a phone number to call a

3  "client advisor." (Id.) The TAC also claims that rather than teach customers

4  concrete real estate information, the Fulfillment Seminars were focused on trying

5  to "up-sell" customers the Trump Gold Elite Program for $34,995 to get the "full

6  education." (TAC ¶ 48.) At the Fulfillment Seminar, Plaintiffs allege TU

7  representatives pressured customers to raise their credit card limits to purchase

8  Trump Elite Programs. (TAC ¶ 49.)

9      **5.  Trump Gold Elite Package**

10     Trump Gold Elite participants were allegedly promised unlimited mentoring

11 for an entire year. (TAC ¶ 53.) Plaintiffs allege that, in fact, Trump University told

12 its mentors that it would not pay them for more than six one-hour mentoring

13 sessions per consumer. (Id.)

14     **C.  The Plaintiffs[7]**

15     The TAC was filed on behalf of six named plaintiffs located in California,

16 Missouri, Florida, and New York. The Plaintiffs are:

17     • Tarla Makaeff, a citizen of California, who purchased the three-day

18       fulfillment seminar in August 2008;

19     • Ed Oberkrom, a 65-year old senior citizen of St. Louis, Missouri, who

20       purchased the three-day seminar in February 2009 and the $25,000

21       Elite seminar in March 2009. He attended the free preview after

22       reading and relying on Trump University advertisements;

23     • Sonny Low, a 71-year old senior citizen of San Diego, California,

24       who attended the free preview on or about November 18, 2009 after

25       learning about it in advertisements. Based on representations made at

26       the free preview, Low purchased the three-day seminar on or about

27    _____

28     [7] The Court does not include Plaintiff Keller, as he does not seek to be a class
    representative at this time. (Pl. Mtn. at 1.)

December 6, 2009 and then paid for the $25,000 Elite seminar in
December 2009;

- J.R. Everett, a 68-year old senior citizen of Tampa, Florida, who
  received an invitation to the free preview from Trump University
  which he attended on October 7, 2009. He then purchased the three-
  day seminar on or about October 7, 2009 and the $35,000 Elite
  seminar on October 16, 2009; and

- John Brown, a 61 year old resident of New York, New York, who
  learned about the free preview in an advertisement and attended the
  free preview on September 14, 2009. He purchased the three-day
  seminar on or about September 14, 2009, and the $25,000 Elite
  seminar on or about September 26, 2009. (TAC ¶¶ 26-31, 95-96, 106.)

Although Plaintiffs' specific experiences with TU seminars and programs
vary, each Plaintiff allegedly purchased the Fulfillment Seminar and/or a Trump
Elite program after exposure to representations made at a free preview.[8] Plaintiffs
contend that their experiences are typical of the proposed class, which consists of
all persons who purchased TU Fulfillment Seminars or Elite programs throughout
the United States from April 30, 2006 to the present. (Dkt. No. 195, "Pl. Reply," at
1-2.)

**D. Proposed Common Evidence**

**1. Promotion of Trump University**

From its inception in 2004 until 2010 when it changed its name to the Trump
Initiative, "Trump University" was the chosen name for the real estate education
business operated by Mr. Trump. A review of TU advertisements demonstrates that
Trump University utilized various forms of recognizable signs to appear to be an
accredited academic institution. TU used a school crest that was ubiquitous and

---

[8] Although named plaintiff Tarla Makaeff did not personally attend a free preview, she
was invited to a Fulfillment seminar for no cost to her by a friend who attended a free preview.
At the Fulfillment seminar, Makaeff allegedly enrolled in an Elite program.

used on TU letterhead, power point presentations, promotional materials and advertisements. (TAC ¶¶ 19, 42.)

In fact, Plaintiffs allege TU was never an accredited academic institution of higher learning and that it was pressed by the New York Board of Education to cease any claim to being a "university" in 2010. (TAC ¶ 2 n.1.)

### 2. The Playbook

Plaintiffs point to TU's Playbook as the "single most important" common evidence that the Live Events (TU seminars and programs) were standardized, tightly controlled schemes with the goal to up-sell students. (Pl. Mtn at 6; Pl. Reply at 11.)[9] The 2010 Playbook is separated into three parts: (1) the "Preview Playbook," which addresses the free seminar; (2) the "Fulfillment Playbook," which addresses the three-day Fulfillment Seminar; and (3) the "Sales Playbook," which offers guidelines to sell TU products. (Dkt. No. 122-3, Ex. 8, "2010 Playbook.")

The Preview Playbook includes timelines for advertising the free seminar in the relevant market as well as detailed instructions for preparation and execution of the free seminar. (Id. at TU 52945-52958.) The Fulfillment Playbook similarly provides an overview and the administrative requirements to run a three-day Fulfillment Seminar. (Id. at TU 52960.)

The Sales Playbook provides several guidelines for TU salespersons to sell TU programs, including tips and scripts to help pitch TU products and services. (Id. at TU 53061-53072.) For example, the Sales Playbook offers two scripts for the salesperson to utilize during the seminars. The "Team Door Introduction Script," welcomes registrants with the following language: "Good Afternoon/Evening! I would like to congratulate you on making it out today . . .

---

[9] Plaintiffs provide a copy of TU's Playbooks for the years 2007, 2008, 2009 and 2010. (Pl. Mtn., Ex. 12, 2010 Playbook; Pl. Reply, Exs. 75-77.) Although the Playbooks have some differences, they utilize similar guidelines, instructions and techniques. The 2009 Playbook incorporates sample TU advertisements and communications to market the Live Events that are not included in the 2010 Playbook.

We have all been hand selected by Trump U and are experts in real estate investing." (Id. at TU 53040.) In a second script, the salesperson introduces the TU instructor with the following language: "It is now my pleasure to introduce one of Donald Trump's top instructors. He has been hand selected because of his expertise and knowledge in the real-estate business." (Id. at TU 53041.) The 2010 Sales Playbook includes a script containing representations that the instructor was "hand-picked" by Donald Trump. (Id. at TU 53041, 53062-63.) The 2009 Playbook includes sample advertisements that include the representation that Donald Trump "handpicked" "world-class instructors." (2009 Playbook at TU 130434, 130436.)

In addition, the Sales Playbook provides extensive talking points for the salesperson to use during one-on-one sessions to sell additional TU products. (2010 Playbook at TU 53042-53053.) The Playbook further directs instructors to rank attendees as potential buyers based on their liquid assets. (Id. at TU 52969.)

TU required its Members to abide by all TU policies and instructions – including the Playbook – regardless of whether individual employees in fact followed specific TU policies. (See Pl. Mtn., Ex. 17, "Sexton Deposition I," 196:16-198:10) (former TU President Michael Sexton testified that all instructors, mentors and salespeople received the Playbook and were required to review the contents); (Pl. Mtn. at 8; Pl. Mtn., Exs. 24, 27) (independent contractor agreements requiring compliance with all TU directives, policies, and instructions).

### 3. PowerPoint Presentations and Scripts

As further common evidence of material misrepresentations, Plaintiffs offer PowerPoint presentations and scripts that TU allegedly required instructors to communicate a consistent message at all TU seminars. (Pl. Mtn. at 26; Pl. Reply at 6-7; Dkt. No. 239, "Supp. Doc.," Ex. 2.) While the presentations vary depending on the instructor and location of the seminar, the presentations share common messages. Most PowerPoint presentations and/or scripts for the free orientation and

1   three-day Fulfillment Seminar: (1) bear the Trump University logo and promote an

2   image of Donald Trump; (2) state that the instructors were "hand-picked" or "hand

3   selected" by the Donald Trump or the "TU founders;" and (3) advertise the three-

4   day fulfillment seminar, one-year apprenticeship program, or Trump Elite

5   packages. (Dkt. No. 138, "Def. Opp.," Ex. 39; Pl. Mtn., Exs. 40, 86, 87; Supp.

6   Doc., Ex. 2.) A small sampling of transcribed TU seminar recordings indicates that

7   several instructors made key statements at issue here, including the alleged

8   misrepresentation that instructors were "hand-picked" by Donald Trump and

9   students would receive one year of unlimited mentorship. (Pl. Reply, Ex. 88.)

## II. DISCUSSION

### A. Class Certification Standards

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. In order to justify a departure from that rule, a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted). To fit within the exception, "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with [Federal Rule of Civil Procedure] 23." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Dukes, 131 S. Ct. at 2551–52).

Rule 23 contains two sets of requirements. First, "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Dukes, 131 S. Ct. at 2550 (internal quotation marks and citations omitted). Second, "[w]here a putative class satisfies all four requirements of 23(a), it still must meet at least one of the three

1  additional requirements outlined in 23(b)." <u>United Steel, Paper & Forestry,</u>

2  <u>Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO, CLC</u>

3  <u>v. ConocoPhillips Co.</u>, 593 F.3d 802, 806 (9th Cir. 2010).

4        On a motion for class certification, the Court is required to "examine the

5  merits of the underlying claim . . . only inasmuch as it must determine whether

6  common questions exist; not to determine whether class members could actually

7  prevail on the merits of their claims." <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d

8  970, 981 n. 8 (9th Cir. 2011) (citations omitted).

9        To create a nationwide class, Plaintiffs have woven a quilt made up of

10  causes of action from all fifty states. The Plaintiffs' trial plan seeks certification of

11  fourteen subclasses for deceptive trade practices, state elder abuse, and common

12  law claims of fraud, breach of contract, breach of covenant of good faith and fair

13  dealing, and unjust enrichment. (Dkt. No. 122-7.) Plaintiffs move to certify a

14  nationwide class of persons who purchased a Trump University 3-day live

15  "Fulfillment" workshop and/or a "Elite" program (collectively, "LiveEvents")

16  within the applicable statute of limitations and have not received a full refund. (Pl.

17  Mtn at 4.)

18        For the reasons set out below, the Court will certify a class and five

19  subclasses of persons residing in California, New York and Florida who purchased

20  a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program

21  ("LiveEvents") within the applicable statute of limitations and have not received a

22  full refund.

23     **1.  Rule 23(a)**

24        The Court examines Plaintiffs' showing on each of the requisite prongs of

25  Federal Rule of Civil Procedure 23, starting with Rule 23(a) requirements of

26  numerosity, commonality, typicality, and adequate representation.

27  ///

28  ///

### a. Numerosity

To justify class certification, the Court must first find that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913–14 (9th Cir. 1964) (internal quotations omitted). As a general rule, "classes of 40 or more are numerous enough." Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 262 (S.D. Cal. 1988) (internal quotations and citations omitted).

Here, Plaintiffs estimate that potential class members of a nationwide class number in the thousands. (Pl. Mtn. at 20) ("thousands of persons"); (Def. Opp. at Ex. 6 ¶¶ a-c, Declaration of Mark Covais, Director of TU Operations, "Covais Decl.") (5,950 students paid between $995 and $1,995 for a three-day introductory seminar). Based on both parties' representations of the potential class size, the Court concludes that the proposed class is sufficiently numerous.

Defendants assert that Plaintiffs have failed to make any showing of numerosity for any subclass, whether by analysis, estimate, statistics, or otherwise. Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981) ("[w]hen a class is subdivided into subclasses, each subclass must independently meet Rule 23 certification requirements."). Plaintiffs estimate that the smallest proposed subclass numbers "in the hundreds." (Pl. Reply at 14.) The Court concludes that the proposed subclasses are sufficiently numerous to make joinder impractical. See Ornates-Hernandez v. Smith, 541 F. Supp. 351, 369 (C.D. Cal. 1982) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").

### b. Commonality

Rule 23(a)(2) requires Plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To show commonality,

1  class members must have "suffered the same injury." Dukes, 131 S. Ct. at 2551

2  (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982)). The

3  commonality requirement demands only that "class members' 'situations share a

4  common issue of law or fact, and are sufficiently parallel to insure a vigorous and

5  full presentation of all claims for relief.' " Wolin v. Jaguar Land Rover N. Am.,

6  LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting Cal. Rural Legal Assistance,

7  Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th Cir. 1990)). Plaintiffs must

8  demonstrate "the capacity of classwide proceedings to generate common answers"

9  to common questions of law or fact that are "apt to drive the resolution of the

10  litigation." Dukes, 131 S. Ct. at 2551. "Dissimilarities within the proposed class

11  are what have the potential to impede the generation of common answers." Id.

12          The Plaintiffs submit that all of the putative class members suffered financial

13  loss resulting from the purchase of TU Live Event programs following exposure to

14  deceptive advertisements and promotional statements. The following questions are

15  common to the proposed class: (1) whether Defendants misrepresented that Trump

16  University was an accredited university; (2) whether Defendants misrepresented

17  that Donald Trump was heavily involved in TU and "hand-picked" the TU

18  instructors; and (3) whether Defendants made misrepresentations about the "year-

19  long" mentoring and interactive support. These questions of fact are at the heart of

20  Plaintiffs' common contention that Defendants misrepresented the benefits of TU's

21  programs and services.

22          Defendants argue no common contention is shared by the potential class

23  members because TU student experiences varied by program, price, contract,

24  content, market, teacher, mentor and resulting individual performance. (Def. Opp.

25  at 18.) Defendants further contend that not all TU instructors or representatives

26  utilized the Playbook or spoke directly from TU talking points or scripts. However,

27  standing alone, this does not defeat commonality. See In re First Alliance Mortg.

28  Co., 471 F.3d 977, 990 (9th Cir. 2006) (concluding that misrepresentations for a

1  claim of fraud do not require verbatim recitation from a script to each class

2  member to satisfy the commonality threshold).

3       As further developed in the predominance discussion, the Court finds that

4  the tightly orchestrated promotional campaign exposed class members to the

5  alleged deceptive and misleading representations that are at issue here. A class

6  action has the ability to determine on a class wide basis whether misrepresentations

7  were made and whether they were material. Class treatment of the claims will

8  allow these common issues to be decided efficiently and economically.

9            **c. Typicality**

10      The Court must determine whether the claims or defenses of the

11 representative parties are typical of the claims or defenses of the class. Fed. R. Civ.

12 P. 23(a)(3). "Under the rule's permissive standards, representative claims are

13 'typical' if they are reasonably co-extensive with those of absent class members;

14 they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011,

15 1020 (9th Cir. 1998). "The purpose of the typicality requirement is to assure that

16 the interest of the named representative aligns with the interests of the class."

17 Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation

18 omitted). "The test of typicality is whether other members have the same or similar

19 injury, whether the action is based on conduct which is not unique to the named

20 plaintiffs, and whether other class members have been injured by the same course

21 of conduct." Id.

22      Plaintiffs argue their claims are typical because each proposed class member

23 was subjected to Defendants' fraudulent up-sell scheme and alleged

24 misrepresentations. (Pl. Mtn. at 30.) In response, Defendants contend Plaintiffs are

25 unique class representatives because: (1) each named Plaintiff purchased different

26 TU programs at prices that varied from most proposed class members; (2) each

27 named Plaintiff viewed different TU advertisements; and (3) each named Plaintiff

28 received different benefits from the TU programs. (Def. Opp. at 19-20.)

1    Upon review of the evidence, the Court concludes the Plaintiffs are not

2  unique class representatives. First, each proposed class representative purchased

3  TU's three-day fulfillment seminar for anywhere between $750 and $1,495. In

4  addition, the proposed class representatives purchased additional TU programs and

5  services. [10] These purchases are sufficiently typical of the 1,661 other potential

6  class members who purchased additional TU products or services beyond the

7  three-day seminar. (Covais Decl. at ¶ 6(c).) Although the specific program, benefit,

8  or price of each TU product may vary, the nature of the claims are the same and

9  Plaintiffs' purchases of TU programs are typical to that of the proposed class

10  members.

11    Moreover, the nature of the claim is based on conduct which is not unique

12  to the proposed class representatives. Here, **Plaintiffs'** claim centers around

13  **Defendants'** allegedly fraudulent scheme to misrepresent the value and benefits of

14  TU's programs and services. The fact that each Plaintiff may have seen a different

15  advertisement, or no advertisement at all, does not defeat typicality. See Hanon,

16  976 F.2d at 508 ("Typicality refers to the nature of the claim or defense of the class

17  representative, and not to the specific facts from which it arose or the relief

18  sought") (internal citations and quotations omitted). As further explained in the

19  predominance analysis, the key in determining typicality and predominance is

20  determining the scope of the advertising and promotions and whether it is likely

21  that all class members were exposed to the allegedly material misrepresentations.

22

23  _____

24  [10] (See Def. Opp., Ex. 55, Makaeff Deposition; Def. Opp., Ex. 57-5844, Low Deposition; Def. Opp., Ex. 57-5848, Everett Deposition; Def. Opp., Ex. 58-5865, Oberkrom Enrollment Form.) Some, in addition to the three-day seminar, purchased a form of "Elite" program.

25  Plaintiffs Oberkrom, Brown and Low paid anywhere between $25,000 and $25,995 for the Field Mentorship program, a part of the Trump Elite program. (Def. Opp., Ex. 58-5867, Oberkrom

26  Enrollment Form; Def. Opp., Ex. 58-5869, Brown Enrollment Form; Def. Opp., Ex. 64-5942, Low Deposition.) Similarly, Plaintiffs Makaeff and Everett purchased the Trump Gold Elite

27  package for $34,995.[10] (Def. Opp., Ex. 58-5857, Makaeff Enrollment Form.) These purchases are typical of the 5,950 other potential class members who paid up to $1,495 for TU's three-day

28  seminar. (Covais Decl. at ¶ 6(b).)

1    Defendants' conduct is not unique to the named Plaintiffs and the Court concludes

2    Plaintiffs have satisfied the typicality element of Rule 23(a).

3              **d. Adequate Representation**

4              Rule 23(a)(4) requires the representative parties to fairly and adequately

5    protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "Adequate representation

6    'depends on the qualifications of counsel for the representatives, an absence of

7    antagonism, a sharing of interests between representatives and absentees, and the

8    unlikelihood that the suit is collusive.'" Crawford v. Honig, 37 F.3d 485, 487 (9th

9    Cir. 1994) (quoting Brown v. Ticor Title Ins. Co., 982 F.2d 386, 390 (9th Cir.

10   1992). Plaintiffs assert they are adequate class representatives who will protect the

11   interests of the class and class counsel will litigate this case vigorously. (Pl. Mtn. at

12   31.) Defendants do not dispute this element. The Court concludes that Plaintiffs,

13   except Ed Oberkrom, have sufficiently shown the representative parties will

14   protect the interests of the class.[11]

15             **2. Rule 23(b)(3)**

16             Under Rule 23(b)(3), a plaintiff must show (i) "that the questions of law or

17   fact common to class members predominate over any questions affecting only

18   individual members," and (ii) that a class action is "superior to other available

19   methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

20   23(b)(3). The Rule lists factors pertinent to a court's assessment of the

21   predominance and superiority criteria: (A) the interest of members of the class; (B)

22   the extent and nature of any litigation concerning the controversy already

23   commenced by or against members of the class; (C) the desirability of

24   concentrating the litigation of the claims in the particular forum; (D) the

25   difficulties likely to be encountered in the management of a class action. Fed. R.

26   Civ. P. 23(b)(3).

27   _____
     [11] As further developed below, the Court finds that this case is not suitable for a
28   nationwide class action. Thus, proposed Plaintiff Ed Oberkrom, a resident of Missouri, is not an
     adequate class representative for the approved California, New York and Florida classes.

### a. Whether Common Issues Predominate

The central Rule 23(b)(3) inquiry is whether "the proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 594 (1997). If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998). " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' " Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535–39 (1986)).

Because the predominance requirement is "more demanding" than Rule 23(a)'s commonality requirement, the Court analyzes each claim for relief and proposed subclass separately. See Amchem, 521 U.S. at 624.

### i. Unfair and Deceptive Trade Practices

Plaintiffs seek to certify three subclasses under California, New York and Florida state unfair competition statutes: (1) a subclass for California class members for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17500 *et seq.*; and California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 *et seq.*; (2) a subclass for New York class members under § 349 of New York's General Business Law; and (3) a subclass for Florida class members under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* and § 817.41.

///

10cv940

### aa. California Subclass

Plaintiffs first propose a California subclass for unfair and deceptive trade practices under California's UCL, CLRA, and FAL. (Dkt. No. 126-14, "Plaintiffs' Trial Plan" at 12.) Each of the claims under these statutes is predicated upon the alleged common misrepresentations identified above.

*California UCL and FAL*

California's UCL provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200 *et seq*. A cause of action under the "fraud" prong of the UCL requires only a showing that members of the public are "likely to be deceived," Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632, 647-48 (1996), rather than "actually deceived or confused by the conduct or business practice in question," Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1167 (2000). Relief under the UCL is available without any proof of deception, reliance, or damages. Brakke v. Econ. Concepts, Inc., 213 Cal. App. 4th 761, 772 (2013).

Similarly, California's FAL makes it unlawful for any business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. "In determining whether a statement is misleading under the statute, the primary evidence in a false advertising case is the advertising itself." Colgan v. Leatherman Tool Grp., Inc., 135 Cal. App. 4th 663, 679 (2006) (citing Brockey v. Moore, 107 Cal. App. 4th 86, 100 (2003)) (internal quotation marks omitted). Whether an advertisement is "misleading" must be judged by the effect it would have on a reasonable consumer. Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087 (9th Cir. 2010) ("consider the effect of misrepresentations upon a reasonable consumer, not a particular consumer") (internal quotation marks omitted); Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008). Liability under either the specific false advertising provisions

1     of the FAL or the broader provisions of the UCL may be found without any

2     individualized proof of deception and solely on the basis a defendant's conduct was

3     likely to deceive customers. <u>Mass. Mutual Life Ins. Co. v. Superior Ct.</u>, 97 Cal.

4     App. 4th 1282, 1289 (2002).[12]

5          Defendants argue that the Plaintiffs have failed to provide documentary

6     **proof of any "misrepresentation" and, instead, have provided a moving target of**

7     claimed misrepresentations. (Def. Opp. at 11.) In addition, Defendants assert that

8     TU advertisements and promotional materials changed frequently, making it

9     unlikely that all of the putative class members were exposed to the same

10     representations. (Def. Opp. Ex. 135, "Sexton Depo." at 202:3-21.)

11          A review of the record reveals substantial evidence of common

12     misrepresentations made to all putative class members. These representations are

13     (1) Trump University was an accredited university; (2) students would be taught by

14     real estate experts, professors and mentors that were hand-picked by Donald

15     Trump; and (3) students would receive one year of expert support and mentoring.

16          Plaintiffs have provided evidence to show that Trump University was not an

17     accredited university; that the seminars were taught by individuals who were not

18     handpicked by Mr. Trump; and that the mentoring claims were false. In view of the

19     above, there is sufficient evidence that these common misrepresentations were

20     deceptive and misleading.

21

22               [12] First, the California Supreme Court has held that plaintiffs need not show
23 individualized reliance to assert violations of California's UCL and FAL. <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 312 (2009). "[W]hile a plaintiff must allege that the defendant's
24 misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct." <u>Id.</u> at 328. Thus, under California law, it "is not required to
25 necessarily plead and prove individualized reliance on specific misrepresentations or false statements where [sic] misrepresentations and false statements were part of an extensive and
26 long-term advertising campaign." <u>Id.</u> Accordingly, "to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to
27 show that members of the public are likely to be deceived." <u>In re Tobacco II Cases</u>, 46 Cal. 4th at 312. The Ninth Circuit has affirmed the California rule " 'that relief under the UCL is available
28 without individualized proof of deception, reliance and injury.' " <u>Stearns v. Ticketmaster Corp.</u>, 655 F.3d 1013, 1021 (9th Cir. 2011) (quoting <u>In re Tobacco II</u>, 46 Cal. 4th at 320).

1    Next, individualized determinations as to reliance and causation are not

2  required as long as certain facts exist to trigger the inferences and presumptions. A

3  key issue in all three consumer claims is whether class members were exposed to

4  the allegedly misleading advertisements. Davis–Miller v. Auto. Club of S. Cal.,

5  201 Cal. App. 4th 106, 125 (2011) ("An inference of classwide reliance cannot be

6  made where there is no evidence that the allegedly false representations were

7  uniformly made to all members of the proposed class."); Cohen v. DIRECTV, Inc.,

8  178 Cal. App. 4th 966, 980 (2009) ("[California law does not] authorize an award .

9  . . on behalf of a consumer who was never exposed in any way to an allegedly

10  wrongful business practice."). The Ninth Circuit has observed that "in the absence

11  of the kind of massive advertising campaign at issue in Tobacco II, the relevant

12  class must be defined in such a way as to include only members who were exposed

13  to advertising that is alleged to be materially misleading." Mazza v. Am. Honda

14  Motor Co., Inc., 666 F.3d 581, 596 (9th Cir. 2012). In Mazza, the Ninth Circuit

15  found defendant Honda's limited advertising campaign, in which "many class

16  members were never exposed to the allegedly misleading advertisement," did not

17  justify a presumption of reliance. Id. In vacating class certification, the Ninth

18  Circuit concluded that the district court had certified an overly broad class where

19  "an individualized case must be made for each member showing reliance." Id.

20    Defendants claim that there were no scripts or uniform promotional

21  materials containing any material misrepresentation. (Def. Opp. Ex. 135, "Sexton

22  Depo." at 202:3-21; Dkt. No. 138-1, "Def. Opp, Ex. 22" a-d: Jamison ¶ 4, Peterson

23  ¶ 7, Horton ¶ 7 and Guarino ¶ 7.) As such, Defendants argue (1) the diversity of

24  TU students requires individualized inquiries; (2) individualized inquiries are

25  needed to prove each claim; (3) reliance on alleged verbal misrepresentations

26  requires individualized inquiry; and (4) the "presumption of reliance" does not

27  apply to prevent individual inquiry. (Def. Opp. at 21-30.)

28

1    The critical question in this case, as posed in <u>Tobacco II</u>, is whether the

2  putative class members were exposed to the same alleged misrepresentations. On

3  one hand, the advertising and promotional activities in the instant case were not

4  part of a massive advertising campaign. On the other hand, unlike the limited

5  advertising in <u>Mazza</u>, there is evidence that the TU multi-media promotional

6  campaign was uniform, highly orchestrated, concentrated and focused on its

7  intended audience.[13] While it was not a long-term campaign as in <u>Tobacco II</u>, it

8  was much more targeted, concentrated, and efficient than <u>Tobacco II</u>. (<u>See</u> Pl.

9  Reply, Ex. 79, "Advertisement Chart.") The effect of this campaign was to make it

10  highly likely that each member of the putative class was exposed to the same

11  misrepresentations. There is substantial evidence that class members paid for TU

12  seminars for reasons that track the advertising and promotional information

13  provided in the highly orchestrated campaign. The Court finds substantial evidence

14  that members of the California subclass were "likely to be deceived" by TU's

15  advertisements. See <u>In re Tobacco II Cases</u>, 46 Cal. 4th at 298.

16  *California CLRA*

17    The CLRA prohibits "unfair methods of competition and unfair or deceptive

18  acts or practices." Cal. Civ. Code § 1770(a). The statute requires that plaintiffs in a

19  CLRA action "show not only that a defendant's conduct was deceptive but that the

20  deception caused the harm." <u>In re Vioxx Class Cases</u>, 180 Cal. App. 4th 116, 129

21  (2009). In a class action alleging violation of the CLRA, "[c]ausation, on a

22

23    [13] This evidence includes: (1) Letters signed by Donald Trump advertising the free
preview (Pl. Mtn., Exs. 29, 32, 34, 38); (2) Promotional videos of Donald Trump used at TU
24  seminars (Pl. Mtn., Exs. 1-2); (3) Website advertisements, (Pl. Mtn., Ex. 36), and Newspaper
ads, (Pl. Mtn., Ex. 37), featuring Donald Trump; and (4) Email advertisements (Pl. Mtn., Ex. 47).
25  (See Dkt. No. 122-7, Proposed Trial Plan at 3, n. 2). In addition, the Playbook provides a two-
month timeline to advertise the free seminar in the relevant market. (2010 Playbook at TU
26  52946.) The "Pre-Event Timeline" includes the following instructions: 8 weeks prior to the
event, "Team Analyzes Market Data and History;" 3 and 2 weeks prior to the event, "Email sent
27  to TU Database;" 7-10 days prior to Event, "Direct Mail" and "Newspaper Ad;" and 1 week
prior to event: "Email to TU Database." (<u>Id.</u>) This timeline shows TU had a uniform strategy to
28  advertise the free seminar in each market by way of direct mail, email, and newspaper
advertisements.

classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." Id. Stated differently, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members." Chavez v. Blue Sky Natural Bev., 268 F.R.D. 365, 376 (N.D. Cal. 2010). Under California law, a misrepresentation or omission is material:

> if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022 (9th Cir. 2011) cert. denied, 132 S. Ct. 1970 (2012) (internal citations omitted).

Defendants submit that there were no scripts or uniform promotional materials containing any material misrepresentation and dispute that there is any documentary evidence of any objective "misrepresentation." (Def. Opp. at 11; Def. Opp. Ex. 135, "Sexton Depo." at 202:3-21.)

As fully discussed in the preceding section, there is substantial evidence that TU made common misrepresentations to all of the class members. A jury could find that a reasonable person would attach importance to these claims in deciding to purchase a TU Live Event program. Consequently, the jury will be required to decide this question of fact.

### bb. New York and Florida Subclasses

The New York General Business law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." N.Y. Gen. Bus. Law § 349 (a). "As a threshold matter, plaintiffs claiming the benefit of section 349 . . . must charge conduct of the

defendant that is consumer-oriented." <u>Oswego Laborers' Local 214 Pension Fund</u> <u>v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 25 (1995). "A prima facie case requires as well a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." <u>Id.</u> (internal citations omitted). New York courts have adopted "an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances. <u>Id.</u> Moreover, "reliance is not an element of a section 349 claim." <u>Stutman v. Chem. Bank</u>, 95 N.Y.2d 24, 29 (2000) (internal citations omitted).

Under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," are considered unlawful. Fla. Stat. Ann. § 501.204 (1). A "consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." <u>Rollins, Inc. v. Butland</u>, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). "The Florida Supreme Court has noted that deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." <u>Zlotnick v. Premier</u> <u>Sales Grp., Inc.</u>, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal quotation marks and citations omitted).

This Court agrees with the California Central District that "[w]ith small differences in wording, all three states [California, New York and Florida] appear to employ the same causation and reliance standard [in their unfair trade and competition laws]." <u>Keegan v. Am. Honda Motor Co., Inc.</u>, 284 F.R.D. 504, 541 (C.D. Cal. 2012) <u>leave to appeal denied,</u> 12-80138, 2012 WL 7152289 (9th Cir.

10cv940

1  Nov. 9, 2012). Based on the same showing of the UCL claims, the Court concludes

2  common issues predominate for alleged violations of New York General Business

3  law and the FDTUPA.

### ii. Financial Elder Abuse

5  Plaintiffs propose two subclasses for financial elder abuse: (1) a California

6  subclass for violations of California Welfare & Institutions Code section 15610.30

7  (a)(1); and (2) a Florida subclass for violations of Florida Statutes section

8  501.2077(a).

9  As relevant here, California Welfare & Institutions Code section 15610.30

10  states in part:

> (a) 'Financial abuse' of an elder occurs when a person or entity does
> any of the following: (1) Takes, secretes, appropriates, obtains, or
> retains real or personal property of an elder or dependent adult for a
> wrongful use or with intent to defraud; (2) Assists in taking, secreting,
> appropriating, obtaining, or retaining real or personal property of an
> elder or dependent adult for a wrongful use or with intent to defraud,
> or both; or (3) Takes, secretes, appropriates, obtains, or retains, or
> assists in taking, secreting, appropriating, obtaining, or retaining, real
> or personal property of an elder or dependent adult by undue
> influence.

Cal. Welf. & Inst. Code § 15610.30 (a). For purposes of this section, "elder" means

any person residing in the state of California who is 65 years of age or older. Cal.

Welf. & Inst. Code § 15610.27. The statute defines two ways a person can "take,

secrete, appropriate, obtain or retain property." The first is when "the person or

entity knew or should have known that this conduct is likely to be harmful to the

elder or dependent adult," and the second is "when an elder or dependent adult is

deprived of any property right, including by means of an agreement, donative

transfer, or testamentary bequest, regardless of whether the property is held

directly or by a representative of an elder or dependent adult." Id. § 15610.30(b),

(c).

Under the FDUTPA, "[a] person who is willfully using, or has willfully used, a method, act, or practice in violation of this part which victimizes or attempts to victimize a senior citizen or a person who has a disability is liable for a civil penalty of not more than $15,000 for each such violation if she or he knew or should have known that her or his conduct was unfair or deceptive." Fla. Stat. Ann. § 501.2077(2). For purposes of this section, "senior citizen" means a person who is 60 years of age or older. Id. § 501.2077(1)(a).

In the TAC, Plaintiffs allege that "Defendants took and/or assisted in the taking of property from Plaintiff Low and all potential California class members who are aged 65 or older with the intent to defraud." (TAC ¶ 209.) To support the FDUTPA claim, Plaintiffs allege Defendants "caused Plaintiff Everett and other [Florida] class members to suffer substantial injury . . . [and] willfully used a method, act or practice in violation of the FDUTPA, which . . . victimized or attempted to victimize senior citizens." (TAC ¶¶ 220, 223.)

Since the California Elder Abuse claim is premised on the same acts as the UCL violations, discussed *supra*, the Court again finds that common questions predominate. See, e.g., In re Nat'l W. Life Ins. Deferred Annuities Litig., 268 F.R.D. 652, 669 (S.D. Cal. 2010) (finding common questions predominate where California Elder Abuse claim was premised on the same acts for the UCL violations). Similarly, violations of the FDUTPA allows for "a heightened civil penalty if a senior citizen or handicapped person is victimized by fraud or attempted fraud in a consumer transaction in violation of FDUTPA." In re Miller, 418 B.R. 406, 412 (Bankr. N.D. Fla. 2009). As such, the Court finds common issues predominate on both senior citizen subclasses.

### iii. Damages

Defendants argue that individualized determinations will be required for the Plaintiffs to establish damages. Defendants submit that even if some TU programs are assumed to have a value less than their sale price, individual inquiry is still

1   needed to determine what value was actually obtained by students. (Defendant's

2   Opposition, p. 25.)

3          "At class certification, plaintiff must present a likely method for determining

4   class damages, though it is not necessary to show that his method will work with

5   certainty at this time." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365,

6   379 (N.D. Cal. 2010) (internal quotations and citation omitted). Moreover, the

7   amount of damages, even if it is an individual question, does not defeat class

8   certification. Leyva v. Medline Indus. Inc., 716 F.3d 510, 513-14 (9th Cir. 2013)

9          At trial, Plaintiffs will seek a total, single monetary sum based on the

10  amount Plaintiffs and other class members paid, plus interest. (Proposed Trial Plan

11  at 1.) After trial, Plaintiffs propose a post-judgment administrative proceeding

12  where Defendants' records will be used to distribute checks to class members

13  based on the amount that they paid. Id.

14         When adjudication of questions of liability common to the class will achieve

15  economies of time and expense, the predominance standard is generally satisfied

16  even if damages are not provable in the aggregate. See Advisory Committee's 1966

17  Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App. at 141 ("[A] fraud perpetrated on

18  numerous persons by the use of similar misrepresentations may be an appealing

19  situation for a class action, and it may remain so despite the need, if liability is

20  found, for separate determination of the damages suffered by individuals within the

21  class."); Wright, Miller, & Kane, 7AA Fed. Prac. & Proc. Civ. § 1781, at 235–37;

22  2 W. Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012)

23  (ordinarily, "individual damage[s] calculations should not scuttle class certification

24  under Rule 23(b)(3)").

25         The Court finds that Plaintiffs' proposed method of calculating damages

26  does not defeat predominance or render the case unmanageable.

27  ///

28  ///

#### iv. Additional Common Law Claims

Plaintiffs seek certification of subclasses based on common law causes of action for the following claims: (1) breach of contract (fourth cause of action) and breach of implied covenant of good faith and fair dealing (fifth cause of action); (2) fraud (eighth cause of action); and (3) unjust enrichment (fourteenth cause of action).[14]

Plaintiffs bear the burden of showing uniformity or the existence of only a small number of applicable standards (i.e. "groupability") among the laws of the fifty states. See, e.g., Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (Ruth Bader Ginsburg, J.). A district court must consider how variations in state law affect predominance and superiority. Id. at 1012. A proponent of a multi-state class action must "creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" Id. at 1017 (relying on In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)); see also Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 401–03 (D.N.J. 1998) (distinctions amongst members of the Class may be "compounded exponentially" by the application of law from various forums). In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); Sikes v. Teleline, Inc., 281 F.3d 1350, 1367 n. 44 (9th Cir. 2002) (assuming trial court was correct in ruling that the laws of all fifty states apply, that alone would render the class unmanageable).

As summarized by the Defendants, "Plaintiffs propose no less than 14 subclasses covering all 50 states with overlapping claims – five of which are statutory (all limited to their state of origin) and nine of which are common law (spread over various combinations of states supposedly having materially identical

---

[14] Plaintiffs do not seek class certification for the claims for money had and received (sixth cause of action), negligent representation (seventh cause of action), and false promise (ninth cause of action). (Pl. Mtn. at 13 n. 4.)

1   law)." (Def. Opp. at 33.) Given the wide range of claims and variance in state laws,

2   Defendants argue the class is unmanageable and therefore not the superior method

3   to adjudicate the action. (Id.)

4        As to all of Plaintiffs' common law claims, the Court agrees with

5   Defendants and further finds that common legal issues do not predominate.

6   Plaintiffs seek to certify the following subclasses:

7       -  Two subclasses for fraud in the 28 states and the District of
8          Columbia that "permit reliance to be shown on a classwide
       basis."
9       -  Four subclasses for unjust enrichment for all 50 states and
10         the District of Columbia, with each subclass grouped to
       correspond to "materially identical legal standards."
11      -  Three subclasses for breach of implied covenant of good
12         faith and fair dealing in 29 states in which "the good faith
       and fair dealing claims are subject to the elements of that
13         state's breach of contract claims."

14

15  (Proposed Trial Plan at 13-15.)

16       As a preliminary matter, Plaintiffs have failed to offer sufficient factual and

17  legal support to satisfy all prerequisites of Rules 23(a) and (b)(3) for these common

18  law claims. See Fed. Judicial Ctr., Manual for Complex Litigation (4th ed.) at §

19  21.23. Plaintiffs have provided a survey of the applicable common law of the 50

20  states and proposed verdict forms for the subclass causes of action. (Dkt. No. 122-

21  7, Exs. A-H.) However, the proposed verdict forms gloss over the differences in

22  the elements of each cause of action among the 50 states. Plaintiffs provide little, if

23  any, analysis to justify proposed verdict forms that do not track the elements of the

24  state causes of action. It is insufficient to merely refer the district court to densely

25  worded articles, graphs, and charts pertaining to each state's laws. Tylka v. Gerber

26  Prods. Co., 178 F.R.D. 493, 498 n. 3 (N.D. Ill. 1998) (proponents of fifty-state

27  class "should not expect the court to ferret through, disseminate, and craft

28  manageable schemes" from "densely worded articles, graphs, and charts, well in

1   excess of 100 pages" in support of such materials when that burden "clearly rests"

2   with the proponents).

3       Moreover, the Court finds the difficulties in class management are

4   compounded by several differences in substantive law for each state common law

5   claim. Manual for Complex Litigation § 21.222 ("The difficulties posed by

6   [differences in law] are likely to be compounded in nationwide or multistate class

7   action litigation raising state law claims or defenses. Differences in applicable law

8   and the number of divergent interests may lead a court to decline to certify a

9   class.").

10       For example, Plaintiffs seek to certify two subclasses for common law fraud

11   claims in states that do not require individualized reliance. (Pl. Mtn. at 41.)

12   Plaintiffs claim that differences that exist among laws of various states can be

13   easily taken into account, and seek to rely on the Ninth Circuit's approval of class

14   treatment for fraud claims that arise out of a "common course of conduct." (Id.)

15   (quoting In re First Alliance Mortg. Co., 471 F.3d 977, 990 (9th Cir. 2006)).

16   Defendants respond that the element of reliance is crucial to common law fraud

17   and that individualized reliance issues defeat predominance for common law fraud.

18   (Def. Opp. at 42) (citing New York, Indiana, and Mississippi federal district court

19   cases).

20       The Court finds that although the Ninth Circuit has followed an approach

21   that "favors class treatment of fraud claims stemming from a common course of

22   conduct," other circuits have "adopted somewhat different standards in identifying

23   the degree of factual commonality required in the misrepresentations to class

24   members in order to hold a defendant liable for class-wide fraud." In re First

25   Alliance Mortg. Co., 471 F.3d at 990. In particular, the Ninth Circuit "common

26   course of conduct" approach differs from that of the Second and Third Circuits,

27   which both highlight "the importance of uniformity among representations made to

28   class members" to allow generalized proof to establish reliance. Id. at 990 n.3

1   (citing <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1255 (2d Cir. 2002); <u>In re</u>

2   <u>LifeUSA Holding, Inc.</u>, 242 F.3d 136, 138-40 (3d Cir. 2001)). Although the

3   certification of subclasses may be appropriate where "applicable state laws can be

4   sorted into a small number of groups, each containing materially identical legal

5   standards," <u>Klay v. Haumana, Inc.</u>, 382 F.3d 1241 (11th Cir. 2004), the Court finds

6   that subclass certification for the fraud claim in this case is inappropriate.

7         In addition, as to the unjust enrichment claims, the common law in various

8   states is conflicting and would make trial unmanageable. The court in <u>In re</u>

9   <u>Conagra Foods Inc.</u>, 908 F. Supp. 2d 1090, 1113-15 (C.D. Cal. 2012), surveyed the

10  conflicts in the law in California, Texas and Illinois as to whether unjust

11  enrichment constituted an independent claim or a remedy.[15] These differences and

12  _____

13  [15] **California** - <u>See</u> <u>Ghirardo v. Antonioli</u>, 14 Cal. 4th 39, 50, 54 (1996) (holding that a plaintiff
    was "entitled to seek relief under traditional equitable principles of unjust enrichment" where

14  other remedies were unavailable and that a claim "'for payment of money' . . . rest[ed] on a
    theory of unjust enrichment"); <u>Melchior v. New Line Prod., Inc.</u>, 106 Cal. App. 4th 779, 793

15  (2003) ("The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the
    result of a failure to make restitution under circumstances where it is equitable to do so.")

16  (quoting <u>Lauriedale Assocs. Ltd. v. Wilson</u>, 7 Cal. App. 4th 1439, 1448 (1992)).

17  **Texas** – A number of Texas courts have concluded that unjust enrichment is not an independent

18  claim under state law. <u>See</u> <u>Show Serv., LLC v. Amber Trading Co. LLC</u>, No. 3:09-CV-2385-D,
    2010 WL 4392544 at *2 (N.D. Tex. Oct. 29, 2010) (citing, inter alia, <u>Redwood Resort Props.,</u>

19  <u>LLC v. Holmes Co.</u>, No. 3:06-CV-1022-D, 2006 WL 3531422 at *9 (N.D. Tex. Nov. 27, 2006));
    <u>Celanese Corp. v. Coastal Water Auth.</u>, 475 F. Supp. 2d 623, 639 (S.D. Tex. 2007) (holding that

20  "[r]estitution and unjust enrichment are remedies, not causes of action"); <u>Wood v. Gateway, Inc.</u>,
    No. 5:03-CV-007-C, 2003 WL 23109832 at *12 (N.D. Tex. Dec. 12, 2003). Others have treated

21  unjust enrichment as a cause of action. <u>Pepi Corp. v. Galliford</u>, 254 S.W.3d 457, 460 (Tex. App.

22  2007) ("Unjust enrichment is an independent cause of action"). The Texas Supreme Court has
    not addressed the question directly, but has spoken of unjust enrichment as if it were an

23  independent cause of action. <u>See</u> <u>HECI Exploration Co. v. Neel</u>, 982 S.W.2d 881, 885 (Tex.
    1998) (recognizing that a two-year statute of limitations governs "unjust enrichment" claims).

24

25  **Illinois** - As with California and Texas, Illinois courts appears divided as to whether unjust
    enrichment is an independent cause of action. <u>Compare</u> <u>Allstate Ins. Co. v. Morgan Guar. Trust</u>

26  <u>Co. of New York</u>, No. 93 C 6527, 1994 WL 48585 at *4 (N.D. Ill. Feb. 16, 1994) ("unjust
    enrichment is not a cognizable separate cause of action under Illinois law") <u>with</u> <u>Peddinghaus v.</u>

27  <u>Peddinghaus</u>, 295 Ill. App. 3d 943, 949 (1998) ("Defendants contend Illinois does not recognize
    an independent cause of action for unjust enrichment. We disagree. Our supreme court has

28  expressly held that to 'state a cause of action based on a theory of unjust enrichment, a plaintiff

1    conflicts would require the Court to decide the applicable state law on unjust

2    enrichment claims in fifty states.

3    Similarly, the Court finds that the differences in the law and the facts

4    relating to the claims for breach of contract and breach of covenant of good faith

5    and fair dealing defeat the predominance that is required to certify a class. The

6    three proposed subclasses are based on states that recognize the breach of the

7    covenant of good faith as a separate cause of action and those that do not.

8    Given the numerous differences that exist as to the common law throughout

9    the fifty states and the number of proposed subclasses, the Court concludes that

10   common legal issues do not predominate as to the proposed common law

11   subclasses and nationwide class certification is not the superior method of

12   adjudicating these state common law claims.

13   **b. Whether Class Action is Superior to Other Methods of Adjudication**

14   Rule 23(b)(3) requires that class resolution must be "superior to other

15   available methods for the fair and efficient adjudication of the controversy." Fed.

16   R. Civ. P. 23(b)(3). "The superiority inquiry under Rule 23(b)(3) requires

17   determination of whether the objectives of the particular class action procedure

18   will be achieved in the particular case." Hanlon v. Chrysler Corp., 150 F.3d 1011,

19   1023 (9th Cir. 1998) (internal citation omitted). Two of the key factors to

20   determining superiority are the "extent and nature of any litigation concerning the

21   controversy already commenced by or against members of the class," and "the

22   likely difficulties in managing a class action." and Fed. R. Civ. P. 23(b)(3)(B), (D).

23   As noted above, Plaintiffs here have failed to show that a class action is the

24   superior method for litigating the state common law causes of action. However, the

25   Court does find that class litigation is superior to other methods of adjudication for

26

27   must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that
     defendant's retention of the benefit violates the fundamental principles of justice, equity, and
     good conscience,' ") (quoting HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d

28   145, 160 (1989)).

two categories of claims: (1) claims for violations of California, New York and Florida unfair and deceptive practices acts (first, second, third, tenth, twelfth and thirteenth causes of action); and (2) financial elder abuse (eleventh and twelfth causes of action). The Court notes that while individual class members' interests are not minuscule, they have little interest in individually controlling actions based on the potential amount in damages. Furthermore, because two of the subclasses involve California consumers and California law, it is desirable to concentrate the litigation in California.

As to the New York subclass, the Court notes that the New York Attorney General has filed a recent case against TU. On October 10, 2013, Defendants filed an ex parte request to file supplemental briefing on the issue of whether the pending action in New York affects the superiority analysis for class certification in this case.[16] (Dkt. No. 272 at 2.) Defendants argue that the pending suit by the New York Attorney General, seeking nationwide relief, defeats superiority for Plaintiffs claims. (Id.) (citing Kamm v. Cal. City Dev. Co., 509 F.2d 205 (1975)). However, Kamm involved the dismissal of a class action where the Attorney General and the Real Estate Commissioner of California had brought a previous suit that had already resulted in restitution to many class members; a permanent injunction; and final judgment on a settlement agreement. 509 F.2d at 212. At this time, no such lawsuit affects this current action.

The Court also notes that Plaintiffs' counsel has filed a related case, Cohen v. Trump, 13-cv-2519-GPC-WVG, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). The Court acknowledges that Rule 23(b)(3)(B) "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits . . . If the court

---

[16] Defendants further filed a Notice of Supplemental Authority and Request for Judicial Notice raising the same concern on January 31, 2014. (Dkt. No. 287.) Plaintiffs responded, (Dkt. No. 288), and Defendants replied, (Dkt. No. 289). As Plaintiffs do not object to the propriety of taking judicial notice of Defendants' offered authority, the Court grants the request for judicial notice.

10cv940

1    finds that several other actions already are pending and that a clear threat of

2    multiplicity and a risk of inconsistent adjudications actually exist, a class action

3    may not be appropriate." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180,

4    1191 opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) (internal

5    citations and quotations omitted). However, courts "**often certify class actions**

6    **arising from similar facts.**" Cartwright v. Viking Indus., Inc., 2009 WL 2982887,

7    *15 (E.D. Cal. 2009) (certifying a class for CLRA, UCL, fraudulent concealment,

8    unjust enrichment, and warranty claims despite a concurrent state court class action

9    certified for warranty claims); see also In re Wells Fargo Home Mortgage

10   Overtime Pay Litig., 527 F. Supp. 2d 1053, 1069 (N.D. Cal. 2007) (concurrent

11   FLSA and UCL class actions). Overall, the Court finds that class-wide litigation on

12   these claims will reduce litigation costs and promote greater efficiency. As such,

13   the Court finds the superiority requirement of Rule 23(b) is satisfied for these

14   claims.

15        **3. Rule 23(g)**

16        Rule 23(g)(1) requires the Court to appoint class counsel. Rule 23(g)

17   provides, *inter alia,* that courts must consider the following factors in appointing

18   class counsel: (i) the work counsel has done in identifying or investigating

19   potential claims in the action; (ii) counsel's experience in handling class actions,

20   other complex litigation, and the types of claims asserted in the action; (iii)

21   counsel's knowledge of the applicable law; and (iv) the resources that counsel will

22   commit to representing the class. Fed. R. Civ. P. 23(g).

23        The Court is satisfied that Plaintiffs' counsel of record Zeldes Haeggquist &

24   Eck, LLP and Robbins Geller Rudman & Dowd LLP meet the criteria of Rule

25   23(b) and should serve as co-class counsel. (See Dkt. No. 122-6.)

26        **B. Evidentiary Objections**

27        In addition to the pending motion for class certification, the parties have

28   filed and fully briefed several related motions and objections:

1.     Defendants' objections to evidence in Plaintiffs' motion for class certification, (Dkt. No. 138-4, "Def. Obj. to Class Cert. Mtn.," 195-9, 213);

2.     Defendants' motion to strike Plaintiffs' declarations, (Dkt. Nos. 138-2, "Def. Mtn. to Strike," 192, 212);

3.     Plaintiffs' motion to strike Defendants' declarations, (Dkt. Nos. 196, "Pl. Mtn. to Strike," 210, 233);

4.     Defendants' motion to strike and objections to improper evidence in Plaintiffs' reply briefs supporting class certification, (Dkt. Nos. 211, "Def. Obj. to Reply Mtn.," 221, 230).

A motion to certify a class is a preliminary procedure. As such, courts do not require strict adherence to the Federal Rules of Procedure or the Federal Rules of Evidence. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). Evidence presented in support of class certification need not be admissible at trial. Ralston v. Mortg. Investors Grp., 2012 WL 629238, *4 (N.D. Cal. 2012) Mazza v. Am. Honda, 254 F.R.D. 273, 279 (C.D. Cal. 2008) (same); Amalgamated Transit Union Local 1309 v. Laidlaw, 2009 WL 249888, *3 (S.D. Cal. 2009) (same).

In this matter, the parties have filed motions to strike declarations and lodged evidentiary objections to evidence. At this stage of the proceedings, the Court DENIES the motions to strike and overrules the evidentiary objections.

### III. CONCLUSION AND ORDER

In accordance with the foregoing, Plaintiffs' motion for class certification is **GRANTED** in part and **DENIED** in part. The Court hereby **GRANTS** Plaintiffs' motion for class certification for the following class and subclasses:

> All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:

10cv940

(1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;

(2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 65 years of age and purchased the program in California within the applicable statute of limitations;

(3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;

(4) a Florida Misleading Advertising Law subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and

(5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 60 years of age and purchased the program in Florida within the applicable statute of limitations.

Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

Additionally, the Court appoints Tarla Makaeff, Sonny Low, J.R. Everett and John Brown as class representatives. Since Ed Oberkrom is not a resident of California, New York, or Florida, the Court declines to appoint him as a class representative. The Court appoints Robbins Geller Rudman & Dowd LLP and Zeldes Haeggquist & Eck, as class counsel.

**IT IS SO ORDERED.**

Date: February 21, 2014

HON. GONZALO P. CURIEL
United States District Judge

10cv940

| | |
|---|---|
| State of California )<br>County of Los Angeles )<br> ) | Proof of Service by:<br>US Postal Service<br>✓ Federal Express |

I, Stephen Moore , declare that I am not a party to the action, am over 18 years of age and my business address is: 631 S Olive Street, Suite 600, Los Angeles, California 90014.

**On** 03/07/2014 declarant served the within: Defendants' Petition for Permission to Appeal Pursuant to FRCP 23(f)

**upon:**

1 Copies ✓ FedEx USPS

Jason A. Forge
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway
Suite 1900
San Diego, California 92101

Attorney for Plaintiffs

1 Copies ✓ FedEx USPS

Amber L. Eck
ZELDES HAEGGQUIST & ECK, LLP
625 Broadway
Suite 1000
San Diego, California 92101

Attorney for Plaintiffs

Copies FedEx USPS

Copies FedEx USPS

the address(es) designated by said attorney(s) for that purpose by depositing **the number of copies indicated above,** of same, enclosed in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of California, or properly addressed wrapper in an Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of California

I further declare that this same day the **original and** copies has/have been hand delivered for filing OR the **original and** 3 copies has/have been filed by ✓ third party commercial carrier for next business day delivery to:

Office of the Clerk
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
95 Seventh Street
San Francisco, California 94103-1526

I declare under penalty of perjury that the foregoing is true and correct:

Signature: *Stephen Moore*